IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

WENDELL E. WHYE and
WILLIAM H. TROUT,

    *Plaintiffs, individually and on*
    *behalf of a class of persons*
    *similarly situated*,

    v.

CONCENTRA HEALTH SERVICES,
INC.,

    *Defendant.*

Civil Action No. ELH-12-3432

## MEMORANDUM OPINION

Plaintiffs Wendell E. Whye and William H. Trout, individually and on behalf of a class of persons similarly situated, filed a putative class action law suit against Concentra Health Services, Inc. ("Concentra"), defendant, alleging that Concentra violated "Maryland law by conducting unlawful job-related breath alcohol tests." Complaint ¶ 1 (ECF 2). In particular, plaintiffs allege that, by conducting breath alcohol tests on the employees and job applicants of public and private Maryland employers, Concentra violated Md. Code (2009 Repl. Vol., 2012 Supp.), § 17-214 of the Health-General Article ("H.G.") (the "Testing Statute"), which regulates the testing of alcohol and controlled dangerous substances by Maryland employers.[1] Recognizing that the Testing Statute does not provide a private right of action, plaintiffs have

---

[1] Defendant removed this case from the Circuit Court of Baltimore City, pursuant to 28 U.S.C. § 1441. *See* ECF 1. *See also* 28 U.S.C. § 1453 (governing removal of class actions). Concentra is a Delaware corporation, with its principal place of business in Addison, Texas. Compl. ¶ 11. It is a subsidiary of Humana, Inc. *Id.* ¶ 4. Plaintiffs are domiciled in Maryland. The Complaint seeks damages in the amount of $10,000 for each of thousands of members of the proposed class. This Court exercises diversity jurisdiction under the Class Action Fairness Act, codified in relevant part at 28 U.S.C. § 1332(d).

lodged common law claims under Maryland law for the tort of intrusion upon seclusion (Count I) and fraud (Count II), seeking both compensatory and punitive damages.

In Count I, plaintiffs allege that "Concentra intentionally invaded [plaintiffs'] privacy by physically intruding upon their right to seclusion and their right to be free of intrusion into private bodily functions," by "subjecting [plaintiffs] to unlawful job-related breath alcohol testing." Compl. ¶¶ 58-59. They also complain that Concentra acted "deliberately, with actual malice, and with the intention of depriving [plaintiffs] of their rights . . . and/or with reckless disregard for those rights." *Id.* ¶ 62. Count II alleges that Concentra "made numerous false representations of material facts" to plaintiffs, *id.* ¶ 66, by "[a]dulterating and using a federally-prescribed form" for breath testing, *id.* ¶ 66a, and by giving plaintiffs "the false impression that the illegal breath alcohol testing procedures . . . had the approval of the federal government, and/or were under the auspices of some required federal testing program." *Id.* ¶ 66b.

Concentra moved to dismiss under Fed. R. Civ. P. 12(b)(6) ("Motion," ECF 9), and filed a supporting memorandum ("Memo," ECF 9-1). Plaintiffs opposed the Motion ("Opposition" or "Opp.," ECF 10), and Concentra replied ("Reply," ECF 11). No hearing is necessary to resolve the Motion. See Local Rule 105.6. For the reasons that follow, I will grant the Motion.

## I.   Factual Background[2]

---

[2] I have construed the facts alleged in the Complaint in the light most favorable to plaintiffs. *See Philips v. Pitt Cnty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). But, I have focused on the facts as they pertain to plaintiffs, rather than the putative class. In *Lewis v. Casey*, 518 U.S. 343, 357 (1996) (internal quotations omitted), the Supreme Court said:

"[T]hat a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other,

A. Concentra's Breath Alcohol Tests

Concentra is an "occupational testing services provider" that offers "job-related alcohol and drug testing services" to employers in forty states, including Maryland. Compl. ¶¶ 4, 11. According to plaintiffs, it "holds itself out" as having "specialized knowledge and expertise" in regard to "workplace drug and alcohol testing…." *Id*. ¶ 22. Its Maryland clientele includes both public and private employers. *Id.* ¶ 25.

Concentra offers Maryland employers a "standing 'protocol' or menu of testing," *id.* ¶ 23, which includes breath alcohol testing conducted at one of Concentra's eleven Maryland facilities. *Id.* ¶ 22. "[A]fter the testing is performed, Concentra sends the . . . employer the test results and an itemized bill for each test rendered." *Id.* ¶ 23.

To administer a breath test, a Concentra "technician" instructs the individual to place a tube into his or her mouth and connects the tube to a "breath testing device." *Id.* ¶¶ 30a-b. The individual is instructed to breathe deeply for several minutes "so as to produce alveolar or 'deep lung' breath for chemical analysis." *Id.* ¶¶ 30c-d. The individual is not allowed to stop the test or leave the testing room while the test is conducted. *Id.* ¶¶ 30e-f. In the event of a positive test result, however, Concentra's breath samples cannot be "retested later for accuracy." *Id.* ¶ 30i. Therefore, plaintiffs assert that the breath testing device used by Concentra during the relevant time was not "an approved device for conducting evidential breath testing under Maryland state law." *Id.* ¶ 30b.

---

unidentified members of the class to which they belong and which they purport to represent." (Internal quotations omitted).

*See also Warth v. Seldin*, 422 U.S. 490, 501 (1975) (holding that named class action plaintiff "must allege a distinct and palpable injury to himself, even if it is an injury shared by a large class of other possible litigants").

Concentra records the test results, as well as other information, on a one-page form titled "Breath Alcohol Testing Form (Non-DOT)" (the "BAT Form"). Compl. ¶ 28. The BAT Form includes four separate boxes or "steps" to be completed by either Concentra's "alcohol technician" or the test subject. *See* Compl. Exh. A, ECF 2 at 27.[3] "Step 1" documents the name and identifying information of the employee being tested, the name and contact information of the employer, and the reason for the test ("Random," "Reasonable Susp.," "Post-Accident," "Return to Duty," "Follow-up," or "Pre-employment"). *Id.* "Step 2" provides a certification to be signed by the employee or the prospective employee, which states: "I certify that I am about to submit to alcohol testing, and that the identifying information provided on the form is true and correct." *Id.* "Step 3" provides a certification to be signed by the alcohol technician performing the test, which states: "I certify that I have conducted alcohol testing on the above named individual, that I am qualified to operate the testing device(s) identified, and that the results are as recorded." *Id.* The technician conducting a breath alcohol test can check a box identifying himself as a "BAT" technician and another box identifying the device, either "breath" or saliva." *See id.* Step 3 also includes several lines for "remarks." *Id.* "Step 4" is a certification "to be completed by [the] employee if [the] test result is 0.02 or higher." *Id.* It states: "I certify that I have submitted to the alcohol test, the results of which are accurately recorded on this form. I understand that I must not drive, perform safety-sensitive duties, or operate heavy equipment because the results are 0.02 or greater." *Id.*

---

[3] The text of the Complaint refers to the BAT Form as Exhibit A, *see* ¶ 28, but the exhibit is not labeled as Exhibit A.

Plaintiffs maintain that the BAT Form is an "adulterat[ed]" version of a form utilized by the U.S. Department of Transportation (the "DOT Form")[4] to conduct alcohol testing on commercial truck drivers, a copy of which is attached as Exhibit B to the Complaint (ECF 2 at 28).[5]  *See* Compl. ¶¶ 62d-g.  The DOT Form, titled "U.S. Department of Transportation (DOT) Alcohol Testing Form," also includes four "steps" and requires substantially the same information as is required on the BAT Form.  *See* Compl. Exh. B.  Of note, both forms contain the same OMB (i.e., Office of Management and Budget) form number at the bottom of the page (the "OMB number"): "OMB No. 2105-0529."  *See* ECF 2 at 28.  Plaintiffs allege that this number gives employees "the false impression that . . . the breath alcohol testing procedures used by Concentra in Maryland had the approval of the federal government, and/or were under the auspices of some required federal testing program."  Compl. ¶ 62e.

However, the DOT Form is unlike the BAT Form in several respects.  In Step 2 of the DOT Form, the certification to be signed by the employee states: "I certify that I am about to submit to alcohol testing *required by US Department of Transportation regulations* and that the identifying information provided on the form is true and correct."  Compl. Exh. B (emphasis added).  Additionally, the certification to be signed by the "alcohol technician" in Step 3 states: "I certify that I have conducted alcohol testing on the above named individual *in accordance with the procedures established in the US Department of Transportation regulation, 49 CFR Part 40*, that I am qualified to operate the testing device(s) identified, and that the results are as

---

[4] In their Opposition, plaintiffs are more descriptive, characterizing the form as "a complete fabrication" and a "phony federal test form…."  Opp. at 4, 26.

[5] The Exhibit is not labeled as Exhibit B, but it is so identified in the text of the Complaint, at ¶ 62(d).

recorded." *Id.* (emphasis added). The DOT Form also includes the following designation, which is not included in the BAT Form: "Form DOT F 1380 (Rev. 5/2008)." *Id.*

    B. Testing of Named Plaintiffs

    Whye and Trout both underwent periodic, random breath alcohol testing as employees of Vector Security, Inc. ("Vector").[6] Whye was employed as a Vector security guard from 2007 until May 2012. *Id*. ¶ 35. In 1980, Whye's larynx was surgically removed due to laryngeal cancer. Therefore, he breathes through a hole (called a "stoma") in his neck. *Id.* ¶ 37. As a result, he "has great physical difficulty both in producing the 'deep lung' alveolar breath required for breath alcohol testing, and also in tolerating the breath alcohol testing procedure." *Id*. Nevertheless, he "was randomly selected on a periodic basis for alcohol and drug testing, with Vector instructing him on short notice to report after his work shift to Concentra's testing center in Arbutus, Maryland for this purpose." *Id.* ¶ 35. Whye was tested "approximately every two or three months," including on the following fifteen occasions: July 7, 2008;[7] August 21, 2008; October 10, 2008; December 12, 2008; March 26, 2009; May 7, 2009; June 11, 2009; August 13, 2009; November 5, 2009; February 4, 2010; April 1, 2010; July 1, 2010; October 21, 2010; January 13, 2011; and July 11, 2011. *Id.* ¶ 38.

    Trout, who is presently employed as a "service technician" for Vector, has also been

---

[6] A BAT Form used for a test conducted on Trout on January 5, 2011, is attached to the Complaint as Exhibit A (ECF 2 at 27). *See* Compl. ¶ 28.

[7] Because Whye and Trout were tested as early as 2008, but did not file suit until 2012, defendant contends that this suit is barred by limitations. *See* Md. Code (2013 Repl. Vol.), §§ 5-101 of the Courts and Judicial Proceedings Article ("C.J."). The plaintiffs argue tolling based on fraud. *See* C.J. § 5-203. They also argue that each test constitutes a separate wrong, and many of the tests were administered within three years of when suit was filed. See Opp. at 28-33. In view of my disposition, I need not address this issue.

"randomly selected on a periodic basis for alcohol and drug testing, with Vector instructing him on short notice to report to Concentra's testing center in Columbia, Maryland for this purpose." *Id.* ¶ 42. Trout was tested "approximately every few months," including on the following seventeen occasions: June 30, 2008; July 30, 2008; August 19, 2008; September 2, 2008; September 16, 2008; September 30, 2008; October 14, 2008; December 16, 2008; April 9, 2009; August 4, 2009; November 12, 2009; January 27, 2010; April 14, 2010; July 6, 2010; January 5, 2011; June 22, 2011; and November 4, 2011. *Id.* ¶ 44.

Whye and Trout do not allege that any of the tests conducted on them yielded a positive result for alcohol, or that Vector ever took disciplinary action against them based on any test results. Nevertheless, plaintiffs posit: "Maryland employees and applicants were ordered by the employers to submit to such testing upon pain of discipline, including termination or denial of employment." *Id.* ¶ 33b. Further, they assert: "Concentra did not obtain consent from [plaintiffs] for the illegal breath alcohol testing." *Id.* ¶ 33. In addition, they allege that Maryland employees and job applicants were never told by Concentra that they were not required to submit a breath specimen and had the right to refuse the test. *Id*. ¶ 26.

## II. Standard of Review

Defendants have moved to dismiss plaintiffs' claims under Fed. R. Civ. P. 12(b)(6). The purpose of a Rule 12(b) Motion is "'to test the sufficiency of a complaint.'" *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010) (citation omitted). "In deciding whether a complaint will survive a motion, a court evaluates the complaint in its entirety, as well as documents attached or incorporated into the complaint" or that are "'integral to and explicitly relied on in the complaint' [where] there [is] no authenticity challenge." *E.I. duPont de Nemours*

& *Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011) (quoting *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999)).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2008); *see Aschroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ." (citation omitted)); *see, e.g., Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011) (applying *Twombly* plausibility standard). Whether a complaint adequately states a claim for relief is judged by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). *See Twombly*, 550 U.S. at 554-55. Rule 8(a)(2) provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Although a plaintiff need not include "detailed factual allegations," the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555. To satisfy the minimal requirements of the rule, the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Id.* at 556 (brackets in original) (internal quotation marks omitted). A complaint that provides no more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of action," is insufficient. *Id.* at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013).

When deciding a motion to dismiss pursuant to Rule 12(b)(6), a court "must accept as true all of the factual allegations contained in the complaint," and "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co.*, 637 F.3d

at 440 (citations omitted).  However, the court is not required to accept legal conclusions drawn from the facts.  *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Monroe v. City of Charlottesville, Va.*, 579 F.3d 380, 385-86 (4th Cir. 2009).  And, if the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint has not shown that "the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (citation omitted).  "A court decides whether this standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to relief.  *A Society Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011).  Dismissal "is inappropriate unless, accepting as true the well-pled facts in the complaint and viewing them in the light most favorable to the plaintiff, the plaintiff is unable to 'state a claim to relief.'" *Brockington v. Boykins*, 637 F.3d 503, 505-06 (4th Cir. 2011) (citations omitted).

Ordinarily, in resolving a motion under Rule 12(b)(6), a court "is not to consider matters outside the pleadings . . . ." *Bosiger v. U.S. Airways, Inc.*, 510 F.3d 442, 450 (4th Cir. 2007).  But, under Fed. R. Civ. P. 12(d), a district court has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it."  5C CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2012 Supp.); *see Kensington Vol. Fire Dep't, Inc. v. Montgomery Cnty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011), *aff'd*, 684 F.3d 462 (4th Cir. 2012).  Generally, if a court considers material outside the pleadings, "the motion must be treated as one for summary judgment under Rule 56," in which case "[a]ll parties must

be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).

There are limited exceptions, however, by which a court may consider extrinsic documents in the context of a motion to dismiss, without converting the motion to one for summary judgment. For instance, the court may properly consider documents "attached to the complaint, as well those attached to the motion to dismiss, so long as they are integral to the complaint and authentic." *Philips, supra*, 572 F.3d at 180 (citations omitted); *see Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004). To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, give rise to the legal rights asserted." *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point,* LLC, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis in original). This exception is justified on the ground that "the primary problem raised by looking to documents outside the complaint—lack of notice to the plaintiff—is dissipated [w]here plaintiff has actual notice . . . and has relied upon these documents in framing the complaint." *Am. Chiropractic*, 367 F.3d at 234 (alterations in original) (internal quotation marks omitted) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)). On this basis, I may consider the BAT Form and the DOT Form, attached as exhibits to plaintiffs' Complaint, without converting the Motion to one for summary judgment.

Additionally, I will take judicial notice of a Declaratory Ruling issued by the Maryland Department of Health and Mental Hygiene ("DHMH"). By letter sent in January 2013, defendant submitted a copy of the ruling to the Court, and plaintiffs subsequently moved to include it as an exhibit to their Opposition. *See* "Plaintiff's Motion to Include Recent Agency

Declaration as Exhibit in Opposition to Defendant's Motion to Dismiss" (ECF 12).   The authenticity of the Declaratory Ruling is not in issue.  Moreover, defendant does not oppose ECF 12, to the extent that DHMH's Declaratory Ruling is subject to judicial notice as a public record, so long as this would not require conversion of the Motion to one for summary judgment.  *See* ECF 13.  *See Philips*, 572 F.3d at 180; *see, e.g.*, *Fakhoury v. Great N. Ins. Co.*, Civ. No. WDQ-12-0268, 2012 WL 1554487, at *1 n.1 (Apr. 30, 2012) ("A court may take judicial notice of matters of public record, including court and administrative filings."); *see also Thomas v. Westchester Cnty. Health Care Corp.*, 232 F. Supp.2d 273, 276 (S.D.N.Y. 2002) ("[T]he Court 'may take judicial notice of the records of state administrative procedures, as these are public records, without converting a motion to dismiss to one for summary judgment.'") (Citation omitted).  I discuss the provenance and content of the Declaratory Ruling, *infra*.

### III.   Discussion

A.   <u>Statutory Background</u>

Plaintiffs' Complaint is rooted in the contention that the breath alcohol tests conducted by Concentra are prohibited by the Testing Statute, H.G. § 17-214, and its implementing regulations.  According to plaintiffs, such testing was "in blatant violation of Maryland law." Compl. ¶ 24.  Moreover, plaintiffs assert that, when Concentra contracts with employers to conduct the tests, it acts "as their agent or proxy."  *Id.* ¶¶ 21-23.  Plaintiffs concede, however, that the Testing Statute "contains no private right of action for its violation," and thus they assert that they "are not suing under the Testing Statute…."  Opp. at 18.  Instead, they maintain that the Testing Statute "informs" and is "simply evidence of" the invasion of their privacy interests resulting from the job-related breath alcohol testing.  Opp. at 18.  Similarly, Concentra's

administration of the breath alcohol test forms the basis of plaintiffs' fraud claim. *See generally* Compl. ¶¶ 66-70.

In its Motion, Concentra lodges a host of challenges. It contends that the Complaint "is deficient because it inadequately pleads invasion of privacy (seclusion) and fraud, is untimely, is brought by Plaintiffs without standing, is entirely premised on statutory requirements inapplicable to Concentra, and insufficiently pleads punitive damages." ECF 9 at 1. In regard to its claim that no invasion of privacy occurred here, it relies, *inter alia*, on the fact that the Testing Statute permits blood alcohol testing.

I am not aware of any State or federal case law addressing the Testing Statute or its implementing regulations, and the parties have not brought any authority to my attention. Before addressing the merits of the Motion, it is helpful to review the statute and its regulatory framework.

### 1. The Testing Statute

H.G. § 17-214 is titled "Job-related alcohol and controlled dangerous substances testing."[8] It was enacted by the Maryland General Assembly in 1988. *See* 1988 Md. Laws, ch. 727 at 4791-93 (1988), and has since been amended several times. Notably, the statute "neither mandates nor prohibits testing." 75 Md. Op. Att'y Gen. 163, 164 (1990) (advising that, under the Testing Statute, "[a]n employer may contract directly with a laboratory" for job-related drug and alcohol testing, and addressing screening of confidential information before transmittal of results to the employer); *accord* Stanley Marazoff & Todd Horn, MARYLAND EMPLOYMENT LAW

---

[8] Title 17 of the Health-General Article is titled "Laboratories." Subtitle 2 is titled "Medical Laboratories."

§ 5.04[1][f] (2d ed. 2008, 2012 Supp.) ("[T]he Maryland legislature has not prohibited the use of drug or alcohol testing [by employers].").  Of import here, the Testing Statute "sets out procedures to ensure fair and accurate drug and alcohol testing procedures when an employer chooses to adopt a testing program." 75 Md. Op. Att'y Gen. at 164.

Aside from laboratory certification requirements in H.G. § 17-214(f), the Testing Statute exclusively targets the conduct of *employers*, not the laboratories or companies that conduct the tests.[9]  Under H.G. § 17-214(h), the procedures apply to any *employer* who requires "job-related alcohol and controlled dangerous substance testing of any person, including pre-employment applicants, employees, and contractors." *See* 75 Md. Op. Att'y Gen. at 164.[10]  Under the statute, "'[j]ob-related' means any alcohol or controlled dangerous substance testing used by an employer for a legitimate business purpose." *Id.* § 17-214(a)(6).  In turn, "'[a]lcohol or controlled dangerous substance testing' means a procedure used to determine whether or not a specimen contains a controlled dangerous substance or alcohol." *Id.* § 17-214(a)(2).

Pursuant to the Testing Statute, "*an employer* who requires any person to be tested for job-related reasons for the use or abuse of any controlled dangerous substance or alcohol shall . . . [h]ave the specimen tested by a laboratory that . . . [h]olds a permit under this subtitle"

---

[9] Although plaintiffs assert that Concentra is the "agent" or "proxy" of the employers, Compl. ¶ 22, they have not clearly explained the basis for suing the laboratory, rather than the employers, given that the testing is conducted at the request of the employer (the principal) and H.G. § 17-214 governs employers.

[10] The Testing Statute does not apply to "[a]lcohol or controlled dangerous substance testing of a person under arrest or held by a law enforcement or correctional agency," H.G. § 17-214(g)(1); "[a]lcohol testing procedures conducted by a law enforcement or correctional agency on breath testing equipment certified by the State Toxicologist," *id.* § 17-214(g)(2); or "[c]ontrolled dangerous substance testing by a laboratory facility of a law enforcement or correctional agency that maintains laboratory testing standards comparable to the standards in this section." *Id.* § 17-214(g)(3).

or, for a laboratory located outside of Maryland, "is certified or otherwise approved" to conduct such testing. *Id.* § 17-214(b)(1)(i) (emphasis added).[11] The Testing Statute defines "specimen" as follows, *id.* § 17-214(a)(11):

(i)    Blood derived from the human body;
(ii)   Urine derived from the human body;
(iii)  Hair derived from the human body[12] . . . ; or
(iv)   Saliva derived from the human body.

Laboratory certification for drug and alcohol testing is governed by H.G. § 17-214(f) and the regulations promulgated by the DHMH. *See also* H.G. § 17-214(a)(3) ("'Certification' means the approval granted by the [DHMH] for a laboratory to engage in job-related alcohol or controlled dangerous substance testing.").[13] "At the time of testing" and "at the person's request," the employer must also "inform the person of the name and address of the laboratory that will test the specimen." *Id.* § 17-214(b)(1)(ii).

The Testing Statute provides employees with several procedural protections in the event of a positive test result. *See id.* § 17-214(c). In particular, if a person tests positive for use of alcohol or a controlled dangerous substance, the employer must provide the person with "[a]

---

[11] Although not at issue here, the Testing Statute permits employers to "use a preliminary screening procedure to test a job applicant for the use or abuse of any dangerous controlled substance." H.G. § 17-214(b)(2)(i)1. "'Preliminary screening procedure' means a controlled dangerous substance test that uses a single-test device that," *inter alia*, "is easily portable and can be administered at a work site or other appropriate collection site." *Id.* § 217-214(a)(10). If a preliminary screen yields a positive result, the employer must "submit the specimen for testing by a laboratory," *id.* § 17-214(b)(2)2(ii), in accordance with H.G. § 17-214(b)(1).

[12] The use of hair as a "specimen" is permitted solely for "pre-employment purposes" by job applicants, and only to test for controlled dangerous substances. *See* H.G. § 17-214(b)(3). For purposes of this opinion, however, I generally include hair as a specimen, without reiterating that it is pertinent only to prospective employees.

[13] Plaintiffs do not allege that Concentra lacked certification to conduct job-related alcohol or controlled dangerous substance testing.

copy of the laboratory tests indicating the test results"; "[a] copy of the employer's written policy on the use or abuse of controlled dangerous substances or alcohol by employees . . . "; and, "[i]f applicable, written notice of the employer's intent to take disciplinary action, terminate employment, or change the conditions of continued employment." *Id.* § 17-214(c)(1)(i)-(iii). Moreover, § 17-214(c)(1)(vi) mandates that the employer furnish the employee with "[a] statement or copy of the provisions set forth in subsection (e) of [the Testing Statute] permitting an employee to request independent testing of the same sample for verification of the test result." This information must be delivered to the employee within thirty days of the test date, "either in person or by certified mail." *Id.* § 17-214(c)(2).

Notably, H.G. § 17-214(e), titled "Verification of test results," states that "[a] person who is required to submit to job-related testing . . . may request independent testing of the same specimen for verification of the test results," to be performed by a laboratory certified by the DHMH. *Id.* § 17-214(e)(1). But, the employee "shall pay the cost of an independent test." *Id.* § 17-214(e)(2).

The Testing Statute also addresses employee confidentiality. *See id.* § 17-214(i). Subject to certain exceptions not pertinent here, H.G. § 17-214(i)(1) states:

> [I]n the course of obtaining information for, or as a result of, conducting job-related alcohol or controlled dangerous substance testing for an employer . . . , a laboratory, a physician, including a physician retained by the employer, or any other person may not reveal to the employer information regarding:
>
> (i)     The use of a nonprescription drug, excluding alcohol, that is not prohibited under the laws of the State; or
>
> (ii)    The use of a medically prescribed drug, unless the person being tested is unable to establish that the drug was medically prescribed under the laws of the State.

H.G. § 17-216 contains a penalty provision that states: "A person who violates any provision of this subtitle is guilty of a misdemeanor . . . ." *Id.* § 17-216. However, as noted, neither the Testing Statute nor its implementing regulations creates a private right of action for employees subjected to drug or alcohol testing that fails to comply with the law.[14]

### 2. Breath Tests Under the Testing Statute

As indicated, the particular specimens identified in the statute are subject to drug and alcohol testing by the State's non-governmental employers. However, the Testing Statute does not include breath within the definition of "specimen." Because the Testing Statute does not explicitly prohibit breath testing, the parties dispute whether the Testing Statute bars breath alcohol testing by private employers. *See*, *e.g.*, Memo at 3, 13; Opposition at 9. This dispute creates an issue of statutory interpretation.

The Fourth Circuit has said that, in interpreting a state statute, a federal court should "apply the statutory construction rules applied by the state's highest court." *In re DNA Ex Post Facto Issues*, 561 F.3d 294, 300 (4th Cir. 2009); *see Carolina Trucks & Equip., Inc. v. Volvo Trucks of N. Am., Inc.*, 492 F.3d 484, 489 (4th Cir. 2007). Maryland "follows the general principles of statutory interpretation." *Johnson v. Mayor & City Council of Balt.*, 430 Md. 368, 377, 61 A.3d 33, 38 (2013). In Maryland, "the chief objective of statutory construction is to discover and effectuate the actual intent of the legislature in enacting the statute." *Deville v. State*, 383 Md. 217, 223, 858 A.2d 484, 487 (2004). To that end, the Maryland Court of Appeals follows a two-step approach, *Johnson*, 430 Md. at 377-78, 61 A.3d at 38:

---

[14] I pause to underscore that enforcement of the Testing Statute is not a matter before me. But, as indicated, a person who violates the Testing Statute could be prosecuted, and presumably a laboratory could lose its permit to conduct the tests.

"First, if the plain meaning of the statutory language is clear and unambiguous, and consistent with both the broad purposes of the legislation, and the specific purpose of the provision being interpreted, our inquiry is at an end." *Breitenbach v. N.B. Handy Co.*, 366 Md. 467, 473, 784 A.2d 569 (2001) (citing *Marriott Employees v. Motor Vehicle Admin.*, 346 Md. 437, 445, 697 A.2d 455 (1997)). "Second, when the meaning of the plain language is ambiguous or unclear, we seek to discern the intent of the legislature from surrounding circumstances, such as legislative history, prior case law, and the purposes upon which the statutory framework was based." *Id.* (citing *DeBusk v. Johns Hopkins Hosp.*, 342 Md. 432, 437, 677 A.2d 73 (1996)).

As noted, the Testing Statute provides that "an employer who requires drug or alcohol testing *shall* . . . have the ***specimen*** tested by a laboratory . . . ." H. G. § 17-214(b)(1)(i) (emphasis added). The word "shall" reflects "the intent that a provision is mandatory." *Dove v. State*, 415 Md. 727, 738, 4 A.3d 976, 982 (2010). The statute indicates that a laboratory shall test a "specimen," and it specifically defines "specimen" as hair, blood, saliva, or urine from the human body; it does not mention breath. "Maryland has long accepted the [canon] of *expressio (or inclusio) unius est exclusio alterius*, or the expression of one thing is the exclusion of another." *Comptroller of the Treasury v. Blanton*, 390 Md. 528, 537, 890 A.2d 279, 285 (2006) (emphasis in original). Although the canon "should be applied with extreme caution," it can "assist in determining the intention of the Legislature where such intention is not manifest from the language used." *Breslin v. Powell*, 421 Md. 266, 294, 26 A.3d 878, 895 (2011).

In my view, the statute's exclusive list of four particular specimens, coupled with the mandatory language as to what a laboratory may test, readily establishes that the plain language of the Testing Statute limits non-governmental employers to drug and alcohol testing of a

person's hair, blood, saliva, or urine; it does not permit breath alcohol testing.[15]

The legislative history puts to rest any doubt as to the plain meaning of the statute. The Testing Statute was twice amended to *add* specimens subject to testing. For example, hair was added as a specimen in 1997, *see* 1997 Md. Laws, ch. 594 (1997), and saliva was added as a specimen in 2003. *See* 2003 Md. Laws, ch. 88 (2003) ("For the purpose of adding saliva derived from the human body to *the list of specimens that may be used* for job-related substance abuse testing.") (emphasis added). There would have been no need to add saliva or hair to the definition of "specimen" if the General Assembly did not intend to limit biological samples available for job-related drug and alcohol testing to those specifically enumerated in the Testing Statute.

It is also salient that legislation has been proposed at least four times in the Maryland House of Delegates to amend the Testing Statute to include "breath" as a specimen. *See* H.B. 1174, 2001 Leg. (Md. 2001) (proposing to amend definition of "specimen" to include "breath from the human body"); H.B. 504, 2005 Leg. (Md. 2005) (proposing to amend definition of "specimen" to include "breath derived from the human body by forced exhalation from the

---

[15] I pause here to note that a person's blood alcohol concentration can be measured directly, by means of a blood alcohol test, or indirectly, by means of a breath alcohol test. "The alcohol content of exhaled air accurately reflects the alcohol content of the blood." U.S. Nat'l Library of Medicine, NIH, MedLine Plus, Entry for "Breath alcohol test," *available at* http://www.nlm.nih.gov/medlineplus/ency/article/003632.htm (last visited Sep. 23, 2013). Notably, for purposes of the prohibition under Maryland law against driving under the influence of alcohol, a person's "alcohol concentration" is defined as grams of alcohol per 100 milliliters of blood or grams of alcohol per 210 liters of breath, such that a person with a concentration of 0.08 or more derived via either measurement is considered to be under the influence of alcohol *per se. See* C.J. § 10-307.

In this Opinion, I use the abbreviation "BAC" to refer interchangeably to blood alcohol concentration as derived either via a breath test or a blood test.

lungs"); H.B. 299, 2006 Leg. (Md. 2006) (proposing same amendment); H.B. 753, 2007 Leg. (Md. 2007) (proposing same amendment). Yet, none of these proposals made it out of committee. *See* Opp. Exh. A (synopsis for HB 1174 showing unfavorable report by House Environmental Matters Committee); Opp. Exh. B (synopsis for H.B. 502 showing no action by House Economic Matters Committee); Opp. Exh. C (synopsis for H.B. 299 showing unfavorable report by House Economic Matters Committee); Opp. Exh. D (synopsis for H.B. 743 showing unfavorable report by House Economic Matters Committee).[16]

The introduction of proposed statutory amendments, and their rejection, are useful to determine legislative intent. *State v. Bell*, 351 Md. 709, 721, 720 A.2d 311, 317 (1998). In *Bell,* the Maryland Court of Appeals said: "'Although we have never held that the amendment-rejection theory is a completely determinative method of ascertaining legislative intent, we have indicated that such action strengthens the conclusion that the Legislature did not intend to achieve the results that the amendment would have achieved, if adopted.'" *Id.* (citation omitted). *See NCR Corp. v. Comptroller*, 313 Md. 118, 125, 544 A.2d 764, 767 (1988) ("While a committee's rejection of an amendment is clearly not an infallible indication of legislative intent, it may help our understanding of overall legislative history."); *see also Coleman v. Soccer Ass'n of Columbia*, 432 Md. 679, 693-94, 69 A.3d 1149, 1157-58 (2013) (stating that General Assembly's consistent and repeated failure to enact legislation can be "a clear indication of legislative policy"); *Napata v. University of Maryland Medical System Corp.*, 417 Md. 724, 739, 12 A.3d 144, 152 (2011); *Comptroller of the Treasury v. Clyde's of Chevy Chase, Inc.*, 377 Md. 471, 502, 833 A.2d 1014, 1032 (2003). The legislative history pertinent here supports the view

---

[16] This information is subject to judicial notice, as a matter of public record.

that the Testing Statute does not allow private employers to conduct breath alcohol testing.

Finally, a prohibition on the use of breath testing by private employers is consistent with the purpose of the Testing Statute. It stated goal was to ensure that employees have an opportunity to challenge positive test results with an independent analysis of the same specimen. *See* 1988 Md. Laws, ch. 727 at 4791 ("FOR the purpose of . . . permitting an employee to request a certain independent verification of the test results from the same sample . . . ."). According to plaintiffs, Concentra's breath testing devices did not permit retesting of breath specimens. For this reason, such testing is barred.

### 3. *DHMH Regulations and Guidance*

The plain meaning of the Testing Statute and its legislative history leave little doubt that breath is not a proper subject for alcohol testing by non-governmental employers. The DHMH, charged with implementing and enforcing the Testing Statute, *see* H.G. § 2-104(b), (m), has issued implementing regulations, a formal declaratory ruling, and informal guidance that make abundantly clear that the Testing Statute does not permit breath alcohol testing by employers in the private sector.

The DHMH's implementing regulations are codified in Title 10, Subtitle 10, Chapter 10 of the Code of Maryland Administrative Regulations ("COMAR"). Chapter 10 is titled "Job-Related Alcohol and Controlled Dangerous Substances Testing." The "purpose" of the regulations is set forth at COMAR 10.10.10.01, which states: "This chapter provides for the protection of employers, employees, and the public by setting fair and effective job-related alcohol and controlled dangerous substances testing standards to ensure accurate and reliable test results and to promote drug-free workplaces."

Like the Testing Statute, the regulations provide "the standards and procedures that employers . . . shall meet when job applicants and employees are required to undergo job-related alcohol and controlled dangerous substances testing." COMAR 10.10.10.02. Parroting the Testing Statute, the regulations require a laboratory to be certified by the DHMH in order to conduct the tests. COMAR 10.10.10.05. Additionally, the regulations impose certain "specimen collection and handling procedures." COMAR 10.10.10.07. In particular, they require a person collecting a specimen to "employ quality assurance and chain-of-custody procedures," COMAR 10.10.10.07(A), and to "collect a quantity sufficient to perform an initial screening test, a confirmation test, and an independent test." COMAR 10.10.10.07(B).

Further, the DHMH regulations include a section providing for notice of positive test results to the employee, COMAR 10.10.10.08(A), as well as an employee's right to an independent test. COMAR 10.10.10.08(B). Those regulatory requirements are substantially identical to the statutory provisions and need not be repeated.

Of import here, the regulations include a section titled "Permissible Specimens." COMAR 10.10.10.06. It states, in relevant part, *id.* (emphasis added):

A. General. An employer requiring job-related alcohol or controlled dangerous substances testing shall require that:

(1) A job applicant provide *only* one or more of the following types of specimen:

(a) Blood;
(b) Urine;
(c) Saliva; and
(d) Hair; and

(2) An employee or contractor provide *only* one or more of the following types of specimen:

> (a) Blood;
> (b) Saliva; and
> (c) Urine.

*B. Specimen Types. An employer requiring job-related alcohol or controlled dangerous substances testing may not require the testing of any specimen other than:*

> *(1) Blood, urine, saliva, or hair, for a job applicant; and*
> *(2) Blood, saliva, or urine, for an employee or contractor.*

Additionally, the regulations define "specimen" as follows, COMAR 10.10.10.03(B)(22) (emphasis added):

> (a) "Specimen" means material derived from the human body and intended for laboratory testing.
> (b) *"Specimen" is limited to blood, urine, saliva, and hair.*

As the provisions cited above reflect, the regulatory language expressly bars the testing of specimens other than urine, saliva, blood, and hair; testing of breath alcohol is not permitted.

Maryland courts generally defer to an agency's interpretation of a statute that it administers. *See Bayly Crossing, LLC v. Consumer Protection Div., Office of Atty. Gen.*, 417 Md. 128, 137, 9 A.3d 4, 9 (2010) ("'[W]e frequently give weight to an agency's experience in interpretation of a statute that it administers.'") (citation omitted); *see, e.g., Waterkeeper Alliance, Inc. v. Md. Dept. of Agriculture*, 211 Md. App. 417, 440, 65 A.3d 708, 721-22 (2013) (deferring to agency's implementing regulations in view of "'agency's experience in interpretation of a statute that it administers'"). With this in mind, it is noteworthy that on December 21, 2012, the DHMH issued a Declaratory Ruling (ECF 12-1), in response to a petition, as amended, by Concentra. *See* Md. Code (2009 Repl. Vol., 2012 Supp.), § 10-304 of the State Government Article (authorizing an interested person to request "a declaratory ruling with respect to the manner in which the unit would apply a regulation . . . of the unit or a statute

that the unit enforces . . . on the facts set forth in the opinion"); COMAR 10.01.02 (DHMH regulations regarding declaratory rulings).

The Declaratory Ruling addressed whether the Testing Statute permits Concentra to conduct breath alcohol testing for Maryland employers, both private and public. *See* ECF 12-1 at 2. In accordance with its "longstanding interpretation," the DHMH concluded that the Testing Statute "permits [private] employers to require only the testing of blood, urine, saliva, and hair derived from the human body for the use or abuse of any controlled dangerous substance or alcohol," and therefore "an employer may not require job-related breath testing for alcohol use." ECF 12-1 at 7. However, "the prohibition does not apply to governmental employers." ECF 12-1 at 8.

In its analysis, the DHMH reviewed its earlier interpretations of the Testing Statute and the guidance it received from the Maryland Office of the Attorney General. In 1993, the Principal Counsel to DHMH concluded, in a letter to the Executive Director of the Governor's Drug and Alcohol Abuse Commission, that urine and blood—the only specimens identified in the Testing Statute at that time—could be used for job-related drug and alcohol testing, and "[i]n order for employers in Maryland to require testing of other types of specimens . . . , the legislature would have to amend" the Testing Statute. *See* Letter of July 2, 1993, from Daniel J. O'Brien, Principal Counsel of DHMH, to Floyd O. Pond, Exec. Dir., Governor's Drug & Alcohol Abuse Comm'n (Exh. 1 to ECF 12-1, at 10-13). Then, in 1999, the Assistant Director for DHMH Laboratory and Ambulatory Care Programs advised in a letter to a doctor: "The Department's interpretation of [COMAR] … and the [Testing Statute] is that breath testing for alcohol is prohibited because it is not a permissible specimen." *See* Letter of December 3, 1999,

from Michael J. Wadja, Ass't Dir. for Laboratory & Ambulatory Care Programs, DHMH, to Stephen Mann, M.D., Med. Dir., Frederick Mem. Healthcare Sys. (Exh. 2 to ECF 12-1, at 14-15). Additionally, in 2001 the DHMH issued a position statement on H.B. 1174; the proposed legislation would have allowed an employer to require job-related alcohol breath testing. The position statement advised: "Currently, neither employers nor licensed laboratories may perform job-related alcohol testing on breath." *See* Exh. 3 to ECF 12-1, at 16.

The DHMH also relied on letters of advice from DHMH's principal counsel at the Maryland Office of the Attorney General, as well as from counsel for the General Assembly. For example, in a letter of May 23, 2012, from Kathryne M. Rowe, Maryland Assistant Attorney General, to Hon. Kevin Kelly, Maryland House of Delegates (Exh. 13 to ECF 12-1, at 40), Ms. Rowe stated that the Testing Statute "prohibits employers from using breath testing for alcohol for employment purposes." *See also* Letter of December 1, 2000, from Wendy A. Kronmiller, Md. Ass't Att'y Gen., to Floyd Wing (Exh. 5 to ECF 12-1, at 18 ) ("As you will see, breath testing is not among the list of 'specimens' permitted by § 17-214 for the job-related testing purposes described in the statute."); Memorandum to File authored by Assistant Attorney General Robert N. McDonald, Esq.,[17] dated July 23, 2001 (Exh. 6 to ECF 12-1, at 19-29), predicting that courts would likely accord deference to the DHMH's interpretation of the Testing Statute.

As recounted, the DHMH concluded in its Declaratory Ruling "that the prohibition [as to breath testing] does not apply to Maryland State and governmental employers." ECF 12-1 at 9.

---

[17] At the time, Robert McDonald served as Chief Counsel for Opinions and Advice in the Office of the Attorney General. He now serves as a judge on the Maryland Court of Appeals.

It observed that, under well settled principles of statutory interpretation applied in Maryland, "a statute does not apply to the State and its political subdivisions 'unless the Legislature provides particular indication in the language that it intended to include the State in its sweep.'" *Id.* at 7 (quoting *Benson v. State*, 389 Md. 615, 648, 878 A.2d 525, 544 (2005)); *see, e.g.*, *Floyd v. Mayor & City Council of Baltimore*, 407 Md. 461, 488, 966 A.2d 900, 916 (2009) (holding certain provisions of Corporations & Associations Article of the Maryland Code not applicable to local government entities); *Atl. Golf Ltd P'ship v. Md. Economic Dev. Corp.*, 377 Md. 115, 126-27, 832 A.2d 207, 214 (2003) (holding provisions of Maryland Constitution pertaining to corporations not applicable to public corporations). Noting that "employer" was not defined to include government employers, and that no statutory language specifically named the State or its subdivisions, DHMH reasoned: "Section 17-214 contains no indication that the legislature intended to prohibit government entities from requiring their employees to subject to breath testing for alcohol use." ECF 12-1 at 8.

As indicated, in Maryland "[t]he consistent and long-standing construction given a statute by the agency charged with administering it is entitled to great deference." *Marriott Empls. Fed. Credit Union v. Motor Vehicle Admin.*, 346 Md. 437, 445, 697 A.2d 455, 459 (1997); *see also Allfirst Bank v. Dep't of Health & Mental Hygiene*, 140 Md. App. 334, 365, 780 A.2d 440, 458 (2001) ("'[T]he contemporaneous interpretation of a statute by the agency charged with its administration is entitled to great deference, especially when the interpretation has been applied consistently and for a long period of time.'") (quoting *Baltimore Gas & Elec. Co. v. Pub. Serv. Comm'n of Md.*, 305 Md. 145, 501 A.2d 1307 (1986)). DHMH's regulations, its consistent interpretation of the Testing Statute in informal guidance and by its Declaratory Ruling,

overwhelmingly comport with the view that Maryland law prohibits private employers from requiring job-related breath alcohol testing.

Given that the DHMH is charged with regulating the Testing Statute, I see no reason to second-guess its interpretation of the statute: breath alcohol testing is not permitted. However, I am mindful that this prohibition was enacted as a procedural mechanism, to protect an employee's ability to obtain a re-test in the event of a positive test result. With this framework, I turn to plaintiffs' allegations.

B. Intrusion Upon Seclusion

Count I is titled "Common Law Tort: Invasion of Privacy By Intrusion Upon Seclusion." Plaintiffs assert that Concentra's breath alcohol tests "resulted in an invasion of [plaintiffs'] personal and private space and dignity that was unlawful, invasive and highly offensive." Compl. ¶ 3. Further, they aver that plaintiffs "had a reasonable expectation of privacy in [their] bodily functions, except as otherwise specifically provided in the Testing Statute and the Testing Regulations regarding lawful job-related drug and alcohol testing, which privacy Concentra invaded and violated by conducting its unlawful breath alcohol tests on [them]." *Id.* ¶¶ 41, 47.

Concentra argues, *inter alia*, that plaintiffs have failed to state a claim because the breath tests did not intrude upon plaintiffs' reasonable expectation of privacy, in that "employees do not have a right to be free from intrusion of bodily functions under [H.G.] § 17-214," nor do they have "a reasonable expectation of privacy in [their] blood alcohol content, regardless of how it is measured." Memo at 4; *see id.* at 4-6. And, even if plaintiffs had such an expectation, Concentra argues that the intrusion occasioned by the tests was not highly offensive to a reasonable person. Reply at 6.

Maryland recognizes an action for unwarranted invasion of privacy. *Carr v. Watkins*, 227 Md. 578, 586, 177 A.2d 841, 845 (1962).[18] The right to privacy is "'the right of the plaintiff to be let alone.'" *Hollander v. Lubow*, 277 Md. 47, 54, 351 A.2d 421, 424 (1976) (quoting W. PROSSER, THE LAW OF TORTS, at 804 (4th ed. 1971)), *cert. denied*, 426 U.S. 936 (1976).

Intrusion upon seclusion is one of four varieties of the umbrella tort of invasion of privacy. *See, e.g.*, *Bailer v. Erie Ins. Exchange*, 344 Md. 515, 525-27, 687 A.2d 1375, 1380-81 (1997); *Pemberton v. Bethlehem Steel Corp.*, 66 Md. App. 133, 163-65, 502 A.2d 1101, 1116-17 (1985), *cert. denied*, 306 Md. 289, 508 A.2d 488, *cert. denied*, 479 U.S. 984 (1986). It constitutes "'[t]he intentional intrusion upon the solitude or seclusion of another or his private affairs or concerns that would be highly offensive to a reasonable person.'" *Mitchell v. Baltimore Sun Co.*, 164 Md. App. 497, 522, 883 A.2d 1008, 1022 (2005) (citation omitted), *cert. denied*, 390 Md. 501, 889 A.2d 418 (2006); *see* Restatement (Second) of Torts § 652B (1977) (describing this branch of the tort as "the intentional intrusion upon the solitude or seclusion of another or his private affairs or concerns that would be highly offensive to a reasonable person")[19]; *see also Furman v. Sheppard*, 130 Md. App. 67, 73, 744 A.2d 583, 585 (2000).

---

[18] The law of the forum state, Maryland, guides this Court's choice-of-law analysis. *See CACI Int'l,, Inc. v. St. Paul Fire & Marine Ins. Co*., 566 F.3d 150, 154 (4th Cir. 2009). In tort cases, Maryland courts apply *lex loci delicti*, *i.e.*, the law of the "place of the alleged harm." *See Proctor v. Wash. Metro. Area Transit Auth.*, 412 Md. 691, 726, 990 A.2d 1048, 1068 (2010). Because the alleged injuries occurred in Maryland, I look to Maryland law.

[19] With respect to privacy torts, the Maryland Court of Appeals has "looked primarily" to the Restatement (Second) of Torts "in defining the kind of conduct that it would regard as actionable." *Pemberton*, 66 Md. App. at 161, 502 A.2d at 1115 (citing *Lawrence v. A.S. Abell Co.*, 299 Md. 697, 475 A.2d 448 (1984)). The three other recognized privacy torts are "'[a]ppropriation of the other's name or likeness'"; "'[p]ublicity given to the other's private life'"; and "'[p]ublicity which places the other in a false light before the public.'" *Hollander*, 277 Md. at 54-55, 351 A.2d at 424-25 (quoting Restatement (Second) of Torts § 652).

Because this tort involves an "intentional intrusion upon the solitude or seclusion of another or his person or affairs," *Pemberton*, 66 Md. App. at 163, 502 A.2d at 1116, "[a]n intrusion upon seclusion claim requires that the matter into which there was an intrusion is entitled to be private and is kept private by the plaintiff." *Barnhart v. Paisano Pubs., LLC*, 457 F. Supp. 2d 590, 593 (D. Md. 2006) (citing *Hollander, supra,* 277 Md. 47, 351 A.2d 421); *accord Fletcher v. Price Chopper Foods of Trumann, Inc.*, 220 F.3d 871, 877 (8th Cir. 2000) ("A legitimate expectation of privacy is the touchstone of the tort of intrusion upon seclusion."). Moreover, "[t]here is . . . no liability unless the interference with the plaintiff's seclusion is a substantial one, of a kind that would be highly offensive to the ordinary reasonable man, as the result of conduct to which the reasonable man would strongly object." Restatement (Second) of Torts § 652B, cmt d (1977). "[C]ourts have construed 'offensive intrusion' to require either an unreasonable manner of intrusion, or intrusion for *an unwarranted purpose*." *Luedtke v. Nabors Alaska Drilling, Inc.*, 768 P.2d 1123, 1137 (Alaska 1989) (emphasis added). If the intrusion is "conducted in a reasonable and non-obtrusive manner, it is not actionable." *Pemberton*, 66 Md. App. at 164, 502 A.2d at 1117. *Compare Barnhart*, 457 F. Supp. 2d at 593 (rejecting claim for intrusion upon seclusion based on a published photograph of the partially nude plaintiff, because "plaintiff's lifting up of her shirt cannot reasonably be said to have constituted a private act," even though "at the moment she removed her shirt she was in the company of only about 10 people, all of whom she knew and trusted") *with Pemberton*, 66 Md. App. at 165, 502 A.2d at 1117 (finding claim of intrusion upon seclusion actionable based on defendants' surveillance of plaintiff in motel room through a "listening device . . . attached to the door");

*1. Reasonable Expectation of Privacy*

In their Complaint, plaintiffs assert, *inter alia*, that they "had a reasonable expectation of privacy in [their] bodily functions, except as otherwise specifically provided in the Testing Statute and the Testing Regulations." Compl. ¶¶ 41, 47.

Concentra counters that plaintiffs had no reasonable expectation of privacy in their BAC, "regardless of how it is measured," including "through breath tests." Memo at 4. It reasons that H.G. § 17-214 permits employers "to order drug and alcohol testing of their employees." Memo at 5. And, it notes that breath alcohol tests "are *less* intrusive than blood tests," which are permitted by the Testing Statute, because breath tests "do not require piercing the skin. . . ." *Id*. Similarly, it asserts that "employees do not have a right to be free from intrusion of bodily functions" under the Testing Statute, Memo at 4, because the Testing Statute gives employers "the right to test pre-employment applicants, employees and contractors" for BAC. *Id*.

Plaintiffs insist that "'blood alcohol content' has nothing to do with this case." Opp. at 16. Rather, they claim a privacy interest in their *breath*, which they contend "falls within the zone of privacy afforded the 'security of one's person' and 'bodily integrity.'" *Id*. at 13 (quoting *Skinner v. Ry. Labor Execs. Ass'n*, 489 U.S. 602, 616-17 (1989)). They state: "[T]he *content* of Plaintiffs' unlawfully tested bodily product is not the basis for their intrusion upon seclusion claim; it is Concentra's *invasion* of their protected zone of privacy in the first place, regardless of breath content." Opp. at 16 (emphasis in original).

To support their claim of a "common law" privacy interest in breath, plaintiffs look, *inter alia*, to the Fourth Amendment. They rely on the Supreme Court's decision in *Skinner v. Railway Labor Executives Association*, 489 U.S. 602 (1989), a Fourth Amendment case, *see* Opp. at 13-15, as well as cases from other jurisdictions that have generally "held that collection

of a person's breath is a seizure implicating privacy concerns." See Opp. at 14 (citing cases). Plaintiffs interpret *Skinner* and other cases as recognizing a privacy interest in breath as a component of a right to privacy in regard to bodily integrity. *See* Opp. at 13-14.

As indicated, plaintiffs suggest that the Testing Statute "informs this Court . . . whether Concentra's breath testing of Plaintiffs was an invasion of privacy," although, as noted, they concede that "it does not create the cause of action or define its contours." Opp. at 18. In my view, the Testing Statute's omission of breath as a lawful specimen for purposes of alcohol testing of non-governmental employees does not create a reasonable expectation of privacy in breath for an employee subjected to drug and alcohol testing. Put another way, the fact that the Testing Statute does not permit employers to test breath does not give rise to a tort claim for intrusion upon seclusion.

Maryland recognizes that "[a]n employer is entitled to expect an employee to report for work . . . drug free." *Dep't of Econ. & Empl. Devel. v. Jones*, 79 Md. App. 531, 536, 558 A.2d 739, 741-42 (1989) (finding that an employee was not entitled to unemployment benefits after being discharged for repeated violations of employer's drug policy, because his conduct "constituted a willful disregard for the standards of behavior that an employer has a right to expect from an employee"). To that end, the Testing Statute permits employers to test for drugs and alcohol, and to do so only by analysis of particular specimens, including blood. An important goal of the Testing Statute was to provide procedural rights and protections for employees whose employers require job-related drug and alcohol testing. Indeed, plaintiffs recognize the concern that motivated the Maryland General Assembly. They assert, Opp. at 8-9 (internal citations omitted):

> [T]he Maryland General Assembly barred job-related breath testing as part of the balance it struck between an employer's right to a drug- and alcohol-free workplace and the rights of employees and job applicants to challenge the accuracy of positive test results by limiting test specimens to those that can be preserved for re-testing. *Because breath cannot be preserved for re-testing, the Testing Statute bans job-related breath tests.* (Emphasis added).

Thus, the Testing Statute's prohibition of breath alcohol testing was meant as a safeguard to protect an employee's right to contest a positive test result. Samples of hair, saliva, urine and blood are available to be retested by an employee, whereas a breath sample is transitory and cannot be captured for retesting. The Maryland General Assembly was not concerned with the privacy of breath, however. Rather, it was concerned with balancing an employer's right to identify substance abuse by its employees, while preserving the employees' rights to challenge the test results.

The statutory preamble, "FOR the purpose of . . . permitting an employee to request a certain independent verification of the test results. . . .)", and the implementing regulations promulgated by the DHMH confirm the purpose of the limitation. COMAR 10.10.10.01 states: "This chapter provides for the protection of employers, employees, and the public *by setting fair and effective job-related alcohol and controlled dangerous substances testing standards to ensure accurate and reliable test results* and to promote drug-free workplaces." (Emphasis added); *see* 75 Md. Op. Att'y Gen., *supra*, at 164.

Clearly, it was the ephemeral nature of breath that was the driving force for the exclusion of the modality of alcohol testing by way of breath. Indeed, the Testing Statute expressly permits more invasive methods of testing, such as blood alcohol tests, which demonstrates that the Legislature was not concerned with bodily integrity when it excluded breath as a specimen. Even accepting that Concentra violated the Testing Statute, which applies

to *employers*, nothing in the statutory language or legislative history suggests, even remotely, that the statute was enacted to enshrine into law an employee's expectation of privacy in "deep lung breath." Plaintiffs have not offered any authority to the contrary. Rather, they have crafted a privacy interest from a strained reading of the Testing Statute.[20]

The only point at which the Testing Statute addresses employee privacy is in its provisions governing confidentiality. *See* H.G. § 17-214(i)(1). Those provisions, however, are concerned with protecting the privacy of the employees' medical information, not their right to bodily integrity. *See id.* (prohibiting testing laboratory or physician's disclosure to employer of "information regarding . . . [t]he use of a nonprescription drug, excluding alcohol, that is not prohibited under the laws of the State; or . . . [t]he use of a medically prescribed drug . . . ."). And, even with regard to these privacy protections, the statute is directed at disclosure *to the employer*, not to the laboratory.

In regard to plaintiffs' tort claim for intrusion upon seclusion, *Furman v. Sheppard*, *supra*, 130 Md. App. 67, 744 A.2d 583, is instructive. In that case, an investigator trespassed on private property owned by a yacht club to videotape Furman, who was a member of the club. *Id.* at 72, 744 A.2d at 585. The club was "surrounded by an electronic security fence and conspicuously posted with 'Trespassers will be Prosecuted' signs," and "the gate to the club

---

[20] It is worth reiterating that the Testing Statute does not apply to Maryland State or local government employers; such employers are not precluded from administering breath alcohol tests. The General Assembly could have provided "that it intended to include the State in its sweep." *Benson,* 389 Md. at 648, 887 A.2d at 544. Because the breath of municipal and State workers would seem equally worthy of privacy protection, this statutory omission arguably supports the view that the General Assembly was not concerned with protecting the privacy of employee breath. Instead, the Maryland legislature was concerned with affording certain protections to employees in the private sector.

[could] only be opened by a magnetic card." *Id.* (some internal quotation marks omitted). The investigator drove to the club, waited for a member to open the gate, entered the club before the gate closed, and then videotaped Furman and his family from within club property. *Id.* However, the video was recorded "while [members of the Furman Family] were on or near a yacht situated in a public waterway and in open view of the public." 130 Md. App. at 75, 744 A.2d at 587.

On these facts, the Maryland Court of Special Appeals found that the plaintiffs failed to state a claim for intrusion upon seclusion, notwithstanding the defendant's trespass, because the plaintiffs "were seen doing things that could be observed by non-trespassing members of the general public." *Id.* at 76, 744 A.2d at 587. It said: "The fact that [the investigator] made the observations while trespassing at appellant's private club does not establish a violation of any reasonable expectation of privacy." *Id.* at 74. 744 A.2d at 586. Rather, "[a] trespass 'becomes relevant only when it invades a defendant's reasonable expectation of privacy.'" *Id.* (citation omitted). Because Mr. Furman was in plain view, the trespass did not violate his right to privacy. *See also Solomon v. National Enquirer*, 1996 WL 635384 (D. Md. 1996) (rejecting invasion of privacy claim based on a photograph taken of a woman inside her house, because she would have been visible through a window to a passerby).

Concentra measured the plaintiffs' BAC by an improper method—breath. But, drawing on *Furman,* the employees had no privacy interest in the information sought by the breath testing. Therefore, the employees' underlying privacy interest in their BAC was not violated.

*Frye v. IBP, Inc.*, 15 F. Supp. 2d 1032 (D. Kan. 1998), is also instructive. In that case, an employee brought a claim against his employer based on mandatory urine drug testing that did

not comport with the employer's own policy, which required reasonable suspicion that the drug use was affecting the employee's ability to function. *Id*. at 1040-41. Of note, the court said, *id.* at 1041-42:

> [C]onsent to a drug test may be inferred when an employee provides a urine sample upon request and, further, that the inference of consent is not negated by the mere fact that refusal to consent may result in termination or other adverse employment action.[ ] We also agree that by accepting employment in a workplace that required drug testing, plaintiff implicitly agreed to comply with [the employer's] policy and protocol on drug testing…. We cannot agree, however, that by accepting employment . . . plaintiff implicitly agreed to submit to any and all demands that [the employer] might exact in the drug testing arena.

The federal court determined that the employer was not entitled to summary judgment based on consent as a defense, because the tests conducted by the employer went beyond the scope of its drug policy. *Id*. at 1042. Nevertheless, even if the employer violated its own policy, the court determined that a reasonable jury would not conclude that the plaintiff suffered "an intrusion on privacy within the meaning of Section 652B of the Restatement (Second) of Torts," because it was not unreasonable for the employer to investigate the information sought—whether the employee was using drugs on the job. *See id.* at 1042.

In addition, *Baggs v. Eagle-Picher Indus., Inc.*, 957 F.3d 268 (6th Cir. 1992), is informative. There, the Sixth Circuit recognized that urine testing "represents an intrusion that a reasonable person might find objectionable." But, the court ruled that such testing did not "invade a matter that the [employees] had a right to keep private…." *Id*. at 275. It said: "There is no dispute that the information [the employer] sought, whether employees were reporting to work with drugs in their systems, was related to the plaintiffs' employment." *Id.* According to the court, Michigan law recognized an employer's right to obtain that information, even if the urine testing was otherwise objectionable, and therefore the employees had no claim for intrusion

upon seclusion. *Id.*; *see also Norris v. Premier Integrity Solutions, Inc.*, 641 F.3d 695, 703 (6th Cir. 2011) (plaintiff, who was on pretrial release in connection with a criminal case, challenged the manner of drug testing, which required "direct observation" of urine sample; concluding that the search was reasonable, it did not violate the Fourth Amendment, and the conduct did not constitute the tort of intrusion upon seclusion).

These authorities teach that an employee who takes a job and accepts a particular drug or alcohol testing policy as a necessary and legitimate condition of continued employment cannot then claim a reasonable expectation of privacy in regard to the object of the testing.[21]  Plaintiffs do not claim that their employer required alcohol tests for reasons unrelated to the performance of their jobs, and they submitted to the drug and alcohol testing for years, as a condition of employment. *See Frye* 15 F. Supp. 2d at 1041; *City of Annapolis*, 317 Md. 544, 565 A.2d 672. That Concentra failed to comply with the Testing Statute by using an unapproved modality to analyze BAC does not mean that plaintiffs were subjected to an invasion of their privacy.

As noted, plaintiffs point to cases that involve Fourth Amendment jurisprudence.  Fourth Amendment case law has distinguished between the privacy interest in bodily integrity, implicated by the physical collection of a specimen from the body for analysis, and the privacy interest in physiological or medical data, implicated by the ensuing analysis of the specimen. *See, e.g., Borse v. Piece Goods Shop, Inc.*, 963 F.2d 611, 621 (3d Cir. 1992) (discussing two privacy interests implicated by urine testing, one relating to the "method used to collect the urine

---

[21] The Maryland employment law treatise authored by Stanley Marazoff and Todd Horn, MARYLAND EMPLOYMENT LAW (2d ed. 2008, 2012 Supp.), states, *id.* § 5.04[1][f]: "It is not an invasion of privacy for a private employer to request an employee or applicant for employment to be tested for illegal drugs or alcohol for legitimate business purposes."  No authority is cited for this proposition, however.

sample" and another relating to the "host of medical facts" that are revealed) (citing *Skinner*, 489 U.S. at 617); *see also Corbin v. Maryland*, 428 Md. 488, 510, 52 A.3d 946, 959 (2012) ("We do not ignore the more profound notion that [a probationer's] privacy is implicated not only by submission to the breathalyzer, but also by the entry of the profile into CODIS, the national DNA database."); *United States v. Davis*, 657 F. Supp. 2d 630, 655 (D. Md. 2009) ("There are two separate recognized privacy interests at stake for persons subject to compulsory DNA sampling pursuant to statute. The first is the physical intrusion necessary to collect the sample, typically by blood draw or buccal swab. . . . The second, and far more significant, intrusion is the analysis and maintenance of the DNA profile in a law enforcement database."), *aff'd*, 690 F.3d 226 (4th Cir. 2012).

However, "[t]he Fourth Amendment does not apply to a search or seizure, even an arbitrary one, effected by a private party on his own initiative." *Skinner*, 489 U.S. at 614. Thus, as Concentra aptly notes, Fourth Amendment case law has limited applicability here. *See* Reply at 5; *see, e.g.*, *Borse*, 963 F.2d at 621 n.10 ("[W]e caution against the wholesale application to private employers of the limitations imposed on public employers by the Fourth Amendment. We find the cases involving government employers helpful, however, in defining the individual privacy interest implicated by urinalysis.").

*Skinner*, a case central to plaintiffs' position, involved a railroad employee's Fourth Amendment challenge to federal regulations mandating blood and urine testing of privately employed railroad workers involved in train accidents. 489 U.S. at 606. The regulations preempted state laws and implicated the Fourth Amendment, even though the tests were conducted by private railroads, because of the Government's "endorsement, and

participation . . ." in the testing.  *Id*. at 615-16.  The Supreme Court stated: "Because it is clear that the collection and testing of urine [and other biological samples] intrudes upon expectations of privacy that society has long recognized as reasonable … we agree, that these intrusions must be deemed searches under the Fourth Amendment[.]"  *Id*. at 617.  However, the testing was deemed reasonable under the Fourth Amendment, even in the absence of a warrant or reasonable suspicion that an employee was impaired, because the compelling and legitimate interest of the government outweighed any privacy concerns of employees.  *Id*. at 633.

As to *blood* testing, the Court acknowledged two privacy invasions: First, the "physical intrusion, penetrating beneath the skin" to extract a blood sample, and second, "[t]he ensuing chemical analysis of the sample to obtain physiological data."  *Id.* at 616; *see also Schmerber v. California*, 384 U.S. 757, 767-78 (1966) (finding a Fourth Amendment search based on "compelled intrusio[n] into the body for blood to be analyzed for alcohol content.").  With respect to *breath* testing, the *Skinner* Court stated, 489 U.S. at 625: "Subjecting a person to a breathalyzer test, which generally requires the production of alveolar or 'deep lung' breath for chemical analysis, implicates similar concerns about bodily integrity … and should also be deemed a search…."  (internal citations omitted).

Nevertheless, the *Skinner* Court said, *id.* at 627: "[T]he expectations of privacy of covered employees are diminished by reason of their participation in an industry that is regulated pervasively to ensure safety, a goal dependent, in substantial part, on the health and fitness of covered employees."  According to the Court, the administration of drug and alcohol testing to "ensur[e] the safety of the traveling public and of the employees themselves plainly justifie[d] prohibiting covered employees from using alcohol or drugs on duty" and "'the exercise of

supervision to assure that the restrictions are in fact observed.'"  *Id.* at 621 (citation omitted).  Of relevance here, the Supreme Court added: "[S]ince the gravamen of the evil is performing certain functions while concealing the substance in the body, it may be necessary, as in the case before us, to examine the body or its fluids to accomplish [the] regulatory purpose."  *Id.* at 633.  In view of the railroad workers' "diminished expectation of privacy that attaches to information pertaining to the[ir] fitness" to work and the "compelling" interests of the Government, the Court held that the warrantless testing of various biological samples did not offend the Fourth Amendment.  489 U.S. at 633.

In *National Treasury Employees Union v. Von Raab*, 489 U.S. 656 (1989), decided on the same date as *Skinner*, the Supreme Court upheld warrantless urine testing for certain United States Customs Service employees against a Fourth Amendment challenge.  The Court said: "[T]he 'operational realities of the workplace' may render entirely reasonable certain work-related intrusions by supervisors and co-workers that might be unreasonable in other contexts," and "certain forms of public employment may diminish privacy expectations even with respect to such personal searches."  *Id.* at 671 (citation omitted).

*Thomson v. Marsh*, 884 F.2d 113 (4th Cir. 1989) (per curiam), also provides guidance.  In that case, the Fourth Circuit found no Fourth Amendment violation in the Army's random urine testing of civilian employees at an Army chemical weapons plant.  It said, *id.* at 115: "The nature of [the employees'] responsibilities is such" that they could not "justifiably expect to keep from their superiors personal information regarding the use of illegal drugs."  Rather, they "enjoy[ed] only diminished expectations of privacy by virtue of the 'special' and 'obvious' demands of their positions."  *Id*.

In *City of Annapolis v. United Food & Commercial Workers, Local 400*, 317 Md. 544, 565 A.2d 672 (1989), the Maryland Court of Appeals considered a Fourth Amendment challenge to mandatory drug and alcohol testing of police and fire personnel "conducted during the course of routine periodic physical examinations in which a urine sample is regularly produced and analyzed." *Id.* at 552, 565 A.2d at 676. The program was "aimed at providing safe and efficient working conditions for these employees and to protect the public by monitoring, treating and deterring the use of illegal drugs." *Id.* Because the employees had "regularly participated for several years, without objection, in providing urine specimens" during their physical examinations, the court was "not . . . concerned with whether the collection of urine itself [was] intrusive on reasonable expectations of privacy grounds." *Id.* Instead, it focused on "the nature of the intrusion—the actual drug analysis of the urine sample." *Id.* Notably, the court said: "[W]e doubt that there is a great expectation of privacy with regard to the mere unobserved passing of urine in the context of a physical examination which is accepted by the employees as necessary for their continued employment with the City." *Id.* at 544, 565 A.2d at 677 (emphasis added). As to the drug analysis, the court added: "The intrusion invades no privacy interest sufficient to counter the compelling interest in deterring and detecting the drug-impaired fitness of uniformed police and fire personnel." *Id.* at 564, 565 A.2d at 682.

The principles of these cases are instructive in assessing plaintiffs' claim that they had a legitimate expectation of privacy in their breath. Concentra is a private company; the testing was not conducted by or for the State; and the testing was not required by the State. The testing of breath in this context was not a search within the meaning of the Fourth Amendment. *Cf. Maryland v. King*, ___ U.S. ____, 133 S. Ct. 1958, 1969 (2013) ("To say that the Fourth

Amendment applies here is the beginning point, not the end of the analysis."). In any event, employees in the private sector in Maryland enjoy diminished expectations of privacy with respect to job-related drug and alcohol testing generally, and the Testing Statute permits the measurement of BAC.

The tort of intrusion upon seclusion "requires that the matter into which there was an intrusion is entitled to be private and is kept private by the plaintiff." *Barnhart*, 457 F. Supp. 2d at 593. While at work, plaintiffs were not entitled to keep private their BAC. In general, an employee may not claim a reasonable expectation of privacy in conduct or information openly monitored by the employer. *See, e.g.*, *Simons*, 206 F.3d at 398-99 (rejecting employee's Fourth Amendment challenge to search of work computer files because company had policy of monitoring computer usage, and therefore employee had no expectation of privacy in files downloaded from internet); *Faulkner v. Maryland*, 317 Md. 441, 447-48, 564 A.2d 785, 788 (1989) (rejecting employee's Fourth Amendment challenge to warrantless search of his workplace locker, conducted by employer in the presence of police, because company policy provided that management could search the locker upon suspicion of alcohol or drugs, and therefore employee lacked a privacy interest in the contents of the locker); *see also Am. Postal Workers Union v. U.S. Postal Serv.*, 871 F.2d 556, 560 (6th Cir. 1989) (concluding that employees had no reasonable expectation of privacy in lockers in light of employer's policies allowing locker inspections). An employee's job-related expectations of privacy are often curtailed by an employer's "practices, procedures, or regulations." *United States v. Simons*, 206 F.3d 392, 398 (4th Cir. 2000); *see Fletcher*, *supra*, 220 F.3d at 877 (finding no expectation of privacy in medical records obtained improperly by employer, because employee had already

disclosed private medical information to coworkers).

It is not surprising, then, that courts in other jurisdictions have rejected employee claims for intrusion upon seclusion based on drug or alcohol testing for legitimate job-related reasons. *See, e.g.*, *Baggs*, *supra*, 957 F.2d at 273-75 (holding, under Michican law, that an employer's mandatory workplace urine testing did not intrude into matters that the employee had a right to keep private, and therefore employee failed to state a claim for intrusion upon seclusion); *Frye, supra*, 15 F. Supp. 2d 1032 (holding, under Kansas law, that employee did not state a claim for intrusion upon seclusion for random drug test administered pursuant to employer's drug testing policy); *Polinski v. Sky Harbor Air Serv., Inc.*, 640 N.W.2d 391, 411-13 (Neb. 2002) (rejecting employee's claim for intrusion upon seclusion based on employer's "taking of a specimen for drug testing purposes," which was conducted in accordance with Nebraska law); *Webster v. Motorola, Inc.*, 637 N.E.2d 203, 430-35 (Mass. 1994) (holding that employer's drug testing policy did not intrude upon seclusion of employee whose job responsibilities involved operating a motor vehicle, but did intrude upon seclusion of employee who had no sensitive job responsibilities); *Groves v. Goodyear Tire & Rubber Co.*, 591 N.E.2d 875, 878 (Ohio Ct. App. 1991) (holding that employer's required drug testing of employee as a condition of employment did not constitute an intrusion upon seclusion); *Luedtke*, *supra*, 768 P.2d at 1137-38 (holding that employee could not state a claim for intrusion upon seclusion based on employer's urine testing, because employee "voluntarily gave a urine sample for purpose of testing" and knew the test results would be reported to his employer); *see also Eddy v. Brown*, 715 P.2d 74, 77 (Okla. 1986) (applying § 652B of the Restatement (Second) of Torts, and holding that an employee may not claim a privacy interest in medical information probative of that employee's fitness or capacity

to work, which was "of legitimate concern to his supervisor").

Ultimately, plaintiffs' complaint boils down to a challenge to the modality of BAC testing; they claim that Concentra performed testing on a specimen prohibited by the Testing Statute. But, testing of breath for alcohol is not permitted only because breath cannot be retested. Plaintiffs have not alleged any facts to demonstrate a reasonable expectation of privacy in their deep lung breath when they reported to Concentra for alcohol and drug tests mandated by their employer. *Cf. Corbin*, 428 Md. at 512, 52 A.3d 960 (observing that the defendant, who was also a probationer, "expected to submit to a breath test" and lacked a viable Fourth Amendment challenge to the surreptitious collection of his DNA from his saliva collected from a straw).

### 2. *Highly Offensive to a Reasonable Person*

To prevail in regard to the tort of intrusion upon seclusion, the conduct in issue must have been highly offensive to a reasonable person. An employee's subjective reaction to a drug test is of no moment in considering whether the conduct at issue impinges upon seclusion. *Frye*, 15 F. Supp. 2d at 1041. "The reasonable person standard is an objective one." *Id*. *See Lane v. Random House, Inc.*, 985 F. Supp. 141, 148-49 (D.D.C. 1995).

As plaintiffs concede, the Testing Statute permits Maryland employers to subject employees to drug and alcohol testing of blood, urine, and saliva. Breath alcohol tests are widely recognized as minimally intrusive with respect to a person's interest in bodily integrity, and certainly less intrusive than the drawing of blood to test for BAC, which is permitted by the Testing Statute. In *Skinner*, the Supreme Court discussed the intrusions occasioned by both blood and breath testing. As to blood tests, it stated:

> [T]he intrusion occasioned by a blood test is not significant, since such "tests are a commonplace in these days of periodic physical examinations and experience

with them teaches that the quantity of blood extracted is minimal, and that for most people the procedure involves virtually no risk, trauma, or pain."

489 U.S. at 625 *(*quoting *Schmerber*, 384 U.S. at 771); *see Schmerber*, 384 U.S. at 771-72 (confirming "society's judgment that blood tests do not constitute an unduly extensive imposition on an individual's privacy and bodily integrity."); *Winston v. Lee*, 470 U.S. 753, 762 (1985) ("blood tests do not constitute an unduly extensive imposition on an individual's privacy and bodily integrity"); *S. Dakota v. Neville*, 459 U.S. 553, 563 (1983) ("The simple blood-alcohol test is . . . safe, painless, and commonplace."); *Breithaupt v. Abram*, 352 U.S. 432, 436 (1957) ("The blood test procedure has become routine in our everyday life.  It is a ritual for those going into military service as well as those applying for marriage licenses.  Many colleges require such tests before permitting entrance and literally millions of us have voluntarily gone through the same, though a longer, routine in becoming blood donors.").

By comparison to blood tests, the *Skinner* Court found breath tests "*even less intrusive*." 489 U.S. at 625 (emphasis added).  It explained:

Unlike blood tests, breath tests do not require piercing the skin and may be conducted safely outside a hospital environment and with a minimum of inconvenience or embarrassment.  Further, breath tests reveal the level of alcohol in the employee's bloodstream and nothing more.  Like the blood-testing procedures . . . , which can be used only to ascertain the presence of alcohol or controlled substances in the bloodstream, *breath tests reveal no other facts in which the employee has a substantial privacy interest*.  In all the circumstances, *we cannot conclude that the administration of a breath test implicates significant privacy concerns*.

*Id.* at 625-26 (emphasis added) (internal citations omitted); *see also United States v. Reid*, 929 F.2d 990, 992 (4th Cir. 1990) ("The Supreme Court has noted that breathalyzer tests are less intrusive than blood tests.") (citing *Skinner*, 489 U.S. at 625).

Recently, in discussing the use of a buccal swab to extract a DNA sample, the Supreme

Court said: "A buccal swab is a far more gentle process than a venipuncture to draw blood. It involves but a light touch on the inside of the cheek; and although it can be deemed a search within the body of the arrestee, it requires no 'surgical intrusions beneath the skin.'" *King*, *supra*, 133 S. Ct. at 1969. Accordingly, it concluded that the intrusion of a buccal swab was "negligible." *Id. Cf. Corbin v. Maryland*, *supra*, 428 Md. at 500, 52 A.3d at 953 ("Collection of a person's DNA by use of a buccal swab . . . is less intrusive than a blood test."); *Maryland v. Raines,* 383 Md. 1, 17-19, 857 A.2d 19, 29 (2004) (describing the invasion of a buccal swab to be "minimal at most").

If breath alcohol testing seeks to obtain the same information as blood alcohol testing, it is difficult to fathom any basis for a finding that a breath test would be highly offensive to a reasonable person under the circumstances presented here, even if the performance of breath testing violated the Testing Statute. *See, e.g.*, *Werner v. Kliewer*, 710 P.2d 1250, 1255-56 (Kan. 1985) (finding no highly offensive intrusion in psychiatrist's release of plaintiff's medical information in custody proceedings involving her husband, when her husband could have obtained the information through "standard court and discovery procedures").

\*     \*     \*

In sum, plaintiffs lacked a legitimate expectation of privacy in their "deep lung breath" when they reported to Concentra for job-related alcohol testing mandated by their employer. Moreover, even if they had a privacy interest, the intrusion occasioned by the breath alcohol tests was not highly offensive. Thus, I will grant the Rule 12(b)(6) motion as to Count I, alleging the tort of intrusion upon seclusion.

C. <u>Fraud</u>

Plaintiffs lodge a claim for fraud under Maryland law, predicated on Concentra's allegedly "false representations" made by using "adulterated" DOT Test forms for its non-DOT breath alcohol tests. *See* Compl. ¶¶ 66a-b. Concentra contends that plaintiffs have failed to satisfy the heightened pleading requirements imposed in connection with a claim for fraud under Fed R. Civ. P. 9(b). It also argues that plaintiffs have failed to state a claim.

Plaintiffs' allegations of fraud implicate the heightened pleading standard under Fed. R. Civ. P. 9(b), which states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *See, e.g.*, *E-Shops Corp. v. U.S. Bank N.A.*, 678 F.3d 659, 665 (8th Cir. 2012) ("Rule 9(b)'s heightened pleading requirement also applies to statutory fraud claims."); *see also Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 781 (4th Cir. 2013) (stating that a Maryland CPA claim that "sounds in fraud, is subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b)").

Under Rule 9(b), a plaintiff alleging claims that sound in fraud "'must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'" *United States ex rel. Owens v. First Kuwaiti Gen'l Trading & Contracting Co.*, 612 F.3d 724, 731 (4th Cir. 2010) (citation omitted). In other words, "'Rule 9(b) requires plaintiffs to plead the who, what, when, where, and how: the first paragraph of any newspaper story.'" *Crest Construction II, Inc. v. Doe*, 660 F.3d 346, 353 (8th Cir. 2011) (citation omitted).

Rule 9(b) serves several salutary purposes:

"First, the rule ensures that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of . . . .

> Second, Rule 9(b) exists to protect defendants from frivolous suits. A third reason for the rule is to eliminate fraud actions in which all the facts are learned after discovery. Finally, Rule 9(b) protects defendants from harm to their goodwill and reputation."

*Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999) (citation omitted).

Notably, however, the plain text of Rule 9(b) permits general averment of aspects of fraud that relate to a defendant's state of mind. And, a "court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Id.* Moreover, Rule 9(b) is "less strictly applied with respect to claims of fraud by concealment" or omission of material facts, as opposed to affirmative misrepresentations, because "an omission 'cannot be described in terms of the time, place, and contents of the misrepresentation or the identity of the person making the misrepresentation.'" *Shaw v. Brown & Williamson Tobacco Corp.*, 973 F. Supp. 539, 552 (D. Md. 1997) (quoting *Flynn v. Everything Yogurt*, Civ. No. HAR-92-3421, 1993 WL 454355, at *9 (D. Md. Sept. 14, 1993)); *accord Gadson v. Supershuttle International*, Civ. No. AW-10-1057, 2011 WL 1231311, at * 9 (D. Md. Mar. 30, 2011).

With the Rule 9(b) standard in mind, I turn to a discussion of the claim of fraud. Under Maryland common law, "'[f]raud encompasses, among other things, theories of fraudulent misrepresentation, fraudulent concealment, and fraudulent inducement.'" *Sass v. Andrew*, 152 Md. App. 406, 432, 832 A.2d 247, 261 (2003) (citation omitted). Regardless of the particular theory, the plaintiff must establish the elements of fraud "by clear and convincing evidence." *Md. Envir. Trust v. Gaynor*, 370 Md. 89, 97, 803 A.2d 512, 516 (2002).

In an action for fraudulent misrepresentation, the plaintiff ordinarily must show:

1) that the defendant made a false representation to the plaintiff;

2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth;

3) that the misrepresentation was made for the purpose of defrauding the plaintiff;

4) that the plaintiff relied on the misrepresentation and had the right to rely on it; and

5) that the plaintiff suffered compensable injury resulting from the misrepresentation.

*Nails v. S&R, Inc.*, 334 Md. 398, 415, 639 A.2d 660, 668 (1994); *accord Thomas v. Nadel*, 427 Md. 441, 451 n.18, 48 A.3d 276, 282 n.18 (2012); *Sass*, 152 Md. App. at 429, 832 A.2d at 260.

"A 'false representation' is a statement, conduct, or action that intentionally misrepresents a material fact." *Sass*, 152 Md. App. at 430, 832 A.2d at 260. Thus, to be actionable, a false representation "must be of a material fact." *Gross v. Sussex, Inc.*, 332 Md. 247, 258, 630 A.2d 1156, 1161 (1993)). "A 'material' fact is one on which a reasonable person would rely in making a decision," *Sass*, 152 Md. App. at 430, 832 A.2d at 260, or a fact that "'the maker of the misrepresentation knows . . . [the] recipient is likely to regard . . . as important.'" *Gross*, 332 Md. at 258, 630 A.2d at 1161 (citation omitted).

Moreover, the "misrepresentation must be made with the deliberate intent to deceive." *Sass*, 152 Md. App. at 430, 832 A.2d at 260 (citing *VF Corp. v. Wrexham Aviation Corp.*, 350 Md. 693, 704, 715 A.2d 188 (1998)); *see Fegeas v. Sherrill,* 218 Md. 472, 476-77, 147 A.2d 223, 225-26 (1958) ("'To create a cause of action, concealment must have been intentional and effective—the hiding of a material fact with the attained object of creating or continuing a false impression as to that fact. The affirmative suppression of the truth must have been with intent to

deceive.'") (Citation omitted); *accord Rhee v. Highland Dev. Corp.*, 182 Md. App. 516, 524, 958 A.2d 385, 390 (2008). And, the defendant must "know[ ] that his representation is false" or be "recklessly indifferent in the sense that he knows that he lacks knowledge as to its truth or falsity." *Ellerin v. Fairfax Savings, F.S.B.*, 337 Md. 216, 232, 652 A.2d 1117 (1995).

Ordinarily, under Maryland law, a mere failure to disclose a material fact does not constitute fraud, in the absence of a legal duty to disclose that inheres in certain types of transactions; "Maryland recognizes no general duty upon a party to a transaction to disclose facts to the other party." *Gaynor*, 370 Md. at 97, 803 A.2d at 516. However, "[e]ven in the absence of a duty of disclosure, one who suppresses or conceals facts which materially qualify representations made to another may be guilty of fraud." *Finch v. Hughes Aircraft Co.*, 57 Md. App. 190, 239, 469 A.2d 867, 892, *cert. denied*, 300 Md. 88, 475 A.2d 1200 (1984), *cert. denied*, 469 U.S. 1215 (1985).

With respect to active suppression or concealment of facts, the Maryland Court of Appeals has said: "Fraudulent Concealment 'is any statement or other conduct which prevents another from acquiring knowledge of a fact, such as diverting the attention of a prospective buyer from a defect which otherwise, he would have observed.'" *Lloyd v. Gen'l Motors Corp.*, 397 Md. 108, 138, 916 A.2d 257, 274 (2007). In other words, it describes a "situation where the defendant actively undertakes conduct or utters statements designed to, or that would, divert attention away from" a material fact. *Id.* at 138 n.11, 916 A.2d at 274 n.11.

"'To create a cause of action, concealment must have been intentional and effective—the hiding of a material fact with the attained object of creating or continuing a false impression as to that fact. The affirmative suppression of the truth must have been with intent to deceive.'"

*Fegeas v. Sherrill*, 218 Md. 472, 476-77, 147 A.2d 223, 225-26 (1958) (citation omitted); *accord*

*Rhee v. Highland Dev. Corp.*, 182 Md. App. 516, 524, 958 A.2d 385, 390 (2008).  As the *Rhee*

Court explained, 182 Md. App. at 536, 958 A.2d at 396 (internal citation omitted) (alterations in

*Rhee*):

> [T]he concealment or suppression [of a material fact] is in effect a representation that what is disclosed is the whole truth. The gist of the action [for fraud] is fraudulently producing a false impression upon the mind of the other party; and if this result is accomplished, it is unimportant whether the means of accomplishing it are words or acts of the defendant . . . .

A "claim of failure to disclose, on the other hand, requires only that the defendant remain

silent about, or omit, facts," and is not actionable unless "the defendant had a duty to disclose."

*Lloyd*, 397 Md. at 138 n.11, 916 A.2d at 274 n.11.  Where the fraudulent concealment claim is

based on a duty to disclose, Maryland courts have formulated the elements of the cause of

actions as follows:

> "(1) [T]he defendant owed a duty to the plaintiff to disclose a material fact; (2) the defendant failed to disclose that fact; (3) the defendant intended to defraud or deceive the plaintiff; (4) the plaintiff took action in justifiable reliance on the concealment; and (5) the plaintiff suffered damages as a result of the defendant's concealment."

*Blondell v. Littlepage*, 413 Md. 96, 119, 991 A.2d 80, 94 (2010) (quoting *Lloyd*, 397 Md. at 138,

916 A.2d at 274) (emphasis omitted).

The Maryland Court of Appeals encapsulated the foregoing principles in *Frederick Road*

*Limited Partnership v. Brown & Sturm*, 360 Md. 76, 100 n.14, 756 A.2d 963, 976 n.14 (2000)

(internal citations omitted):

> Ordinarily, non-disclosure does not constitute fraud unless there exists a duty of disclosure.  Absent a fiduciary relationship, this Court has held that a plaintiff seeking to establish fraudulent concealment must prove that the defendant took affirmative action to conceal the cause of action and that the

plaintiff could not have discovered the cause of action despite the exercise of reasonable diligence, and that, in such cases, the affirmative act on the part of the defendant must be more than mere silence; there must be some act intended to exclude suspicion and prevent injury, or there must be a duty on the part of the defendant to disclose such facts, if known.

Here, plaintiffs have alleged a claim for fraudulent misrepresentation, as opposed to fraudulent inducement or concealment. *See* Compl. ¶ 66 ("Concentra made numerous false representations . . . ."). They state: "The basis for Plaintiffs' fraud claim is the allegation that Concentra used a phony 'federal testing' form to trick [plaintiffs] into thinking that Concentra's unlawful breath testing was authorized or even required by the federal government." Opp. at 20. In particular, they claim that the "Non-DOT" header and the Office of Management and Budget form number on Concentra's BAT Form gave "the false impression that the illegal breath alcohol testing procedures . . . had the approval of the federal government, and/or were under the auspices of some required federal testing program." Compl. ¶ 66.b. But, on the facts alleged, their claim fails to satisfy several of the elements for fraud.

In my view, plaintiffs have failed to allege a deliberately false representation made with the intent to deceive.

In the first instance, the header "Non-DOT" was not a false representation. Rather, it was an accurate description of the testing, *i.e.*, that the breath test was *not* under the purview of the Department of Transportation.

Additionally, the meaning of the OMB form number is ambiguous, at best. The use of the OMB number could suggest that Concentra was "borrowing" a form used by another entity and inadvertently copied the OMB number. This is particularly so given that plaintiffs had reported for testing by Concentra on numerous occasions, and knew or should have known that

Concentra was not a government entity. Even if the OMB number could be understood to imply that the form was a federal form, however, the form did not state that the testing was authorized or required by the federal government. "'A statement that is vague and indefinite in its nature and terms' cannot support a claim of fraud." *Lasater v. Guttmann*, 194 Md. App. 431, 472, 5 A.3d 79, 103 (2010) (quoting *Goldstein v. Miles*, 159 Md. App. 403, 436, 859 A.2d 313, 332 (2004)); *accord Fowler v. Benton*, 229 Md. 571, 579, 185 A.2d 344 (1962). "This is because such statements are deemed to put the party to whom they are made on inquiry notice to investigate further." *Lasatar*, 194 Md. App. at 472, 5 A.3d at 103; *see Goldstein*, 159 Md. App. at 436, 859 A.2d at 332 ("'[I]ndefinite misrepresentations ought to put the person to whom they are made, upon the inquiry, and if he chooses to put faith in such statements, and abstained from inquiry, he has no reason to complain.'") (Citation omitted).[22]

A comparison between the BAT Form and the DOT Form illustrates the weakness of plaintiffs' claim. Unlike the BAT Form, the DOT form *does* expressly represent that the breath test is being administered pursuant to federal law. As indicated, "Step 2" of the DOT Form is a certification to be signed by the employee, which states: "I certify that I am about to submit to alcohol testing *required by US Department of Transportation regulations*, and that the identifying information provided on the form is true and correct." Compl. Exh. B (emphasis added). Additionally, the certification to be signed by the "alcohol technician" in Step 3 states: "I certify that I have conducted alcohol testing on the above named individual *in accordance with the procedures established in the US Department of Transportation regulation, 49 CFR*

---

[22] Plaintiffs do not allege that they ever inquired of Concentra about the significance of the form number or even the "Non-DOT" header.

*Part 40*, that I am qualified to operate the testing device(s) identified, and that the results are as recorded." *Id.* (emphasis added). No such references to Department of Transportation regulations, or any other federal regulations, were made in the BAT Form.

It follows that neither the "Non-DOT" header nor the OMB form number constitutes a material representation "on which a reasonable person would rely in making a decision" to undergo the breath alcohol tests. *Sass*, 152 Md. App. at 430, 832 A.2d at 260. And, plaintiffs' Complaint clearly indicates that they did not rely on these "representations." They reported to Concentra to undergo breath tests upon threat of discipline or job termination, not because of an OMB form number or "Non-DOT" header.

Plaintiffs' allegations as to scienter are equally baseless. Plaintiffs suggest that the "Non-DOT" header and OMB form number were an "elaborate scheme" devised to "persuad[e] Plaintiffs that Concentra's illegal testing program was in fact above-board." Compl. ¶ 68. But, the BAT Forms hardly merit that inference. Concentra removed or modified every other reference to DOT regulations. Thus, a far more reasonable inference is that Concentra mistakenly failed to remove the OMB form number and made use of OMB's forms. Certainly, the use of the form does not connote that OMB approved the test itself. Indeed, plaintiffs have not explained what Concentra gained by administering breath tests, as opposed to some other form of test, when employers would have been obligated to pay for both.

Finally, plaintiffs did not suffer damages. They concede that they were not fired as a result of submitting to the breath tests. In fact, they allege that their test results were negative. Instead, they assert that they were subject "to the indignity and invasion of privacy caused by the illegal testing regime." Compl. ¶ 70; *see* Opp. at 23-24 (arguing that invasion of privacy

occasioned by breath tests constitutes harm).  But, as discussed, plaintiffs did not suffer an invasion of privacy as a result of the tests, as they had no reasonable expectation of privacy as to their breath or to the information obtained from the testing of their breath.  Therefore, the fraud claim fails as well.[23]

## IV.    Conclusion

For the foregoing reasons, I will grant defendant's Motion as to Count I, with prejudice. As to Count II, I am mindful of the liberal standard for amendment of pleadings under Fed. R. Civ. P. 15(a).  Although it seems unlikely that plaintiffs will be able to amend their complaint to state a cognizable fraud claim, dismissal of Count II with prejudice would be premature at this juncture.  Therefore, I will grant leave to amend within 14 days of the date of docketing of the accompanying Order.  However, if a timely amended complaint is not filed, the dismissal will be with prejudice.  *See Choice Hotels Int'l, Inc. v. Goodwin & Boone*, 11 F.3d 469, 471 (4th Cir. 1993) (stating that a district court is entitled to "dismiss the plaintiff's action without prejudice but with conditions that the plaintiff must satisfy, and to specify that the dismissal will become prejudicial if the plaintiff fails to satisfy the conditions," so long as the "district court's specification [is] explicit and clear").

An Order follows.


Date:   September 24, 2013                           _____/s/_____
                                                     Ellen Lipton Hollander
                                                     United States District Judge

---

[23] Accordingly, I need not address defendant's other arguments, including the contention that plaintiffs' claims are barred by the statute of limitations.